May it please the court I'd like to reserve two minutes. Keep your eye on the clock and we'll try to help. Thank you very much. And please keep your voice up. May it please the court Mark Regan for it's pronounced Gallant Donna Marie Gallant who is the claimant here. This is also a Social Security case it's both a young woman who went through a catastrophic auto accident in 2008. She sustained a traumatic brain injury in that auto accident combined with some pre-existing mental health problems that she was experiencing at the time. That led to the original decision that she was disabled under Social Security standards. As Social Security's been trying to decide whether she continues to be disabled it had before it a number of neuropsychological examinations. There was one examination which the administrative law judge deliberately decided to give no weight to not little weight but no weight. That's one of the issues that we are focusing on now. And also there was evidence in the record about Ms. Gallant's continuing problems with handling of this evidence at the administrative law judge hearing has contributed to problems. First there's an incorrect comparison of Ms. Gallant's current condition with the condition at the time the disability decision was made. Second there is an incorrect assessment of her residual functional capacity at the time of the hearing. That incorrect assessment led to the hypothetical questions being phrased to the vocational expert leaving out problems that her mood disorder imposes on her ability to work and leaving out her need for breaks and quiet time if she suffers from headaches. So there are two basic problems one with medical improvement the other with current disability. To look at what was disabling in the original decision the most recent decisions being used for comparison purposes we need to start with the reasons why she was found disabled and there is agreement with the administrative law judge and with Social Security now as to where to find that that's at pages 125-126 of the record in Social Security's large volume. It's also pages 125 and 126. There's a reference to mental health visits. There is a reference to the effects of the traumatic brain injury being assessed in the context of a pre-morbid psychological history significant for mentioned by the administrative law judge in his decision and that her adjustment prior to the accident was poor, that she was homeless, that she was couch-surfing, that she needed extensive family support in order to deal with hassles and stress. And then Social Security makes the decision that justifies disability. A lot of pre-existing problems that my client was experiencing at the time. That was when? What date was that? That assessment was in 2009. The accident was in 2008. And so what has to be found now as a take-off point is you have to compare her medical conditions then and on the cutoff date. On the cutoff date, which is in 2012. There has to be a change in the medical condition. There has to be a change. Did the ALJ ever make that comparison? The ALJ did make the comparison, although as we point out, the ALJ used the wrong date for the initial comparison. All right, but aside from that, where did he make the comparison? The comparison is throughout the decision, although I will say this, the administrative law judge spent more time dealing with what he viewed as... I'm sorry, I'm not hearing you. Could you speak up? I'm sorry. The administrative law judge spent more time dealing with what he viewed as the current disability findings than he did with what had happened before. The medical condition, as I understand it, before you get to function, the medical condition from 2009 and 2012. With respect to physical medical conditions, by the time Social Security made its initial decision, there was not much physical limitation that factored into it. She'd been in a terrible car accident. She lost her baby, but she was on her way back so far as physical disability. And throughout this, I think we've been dealing with the idea of limitations to sedentary or light work. And that's discussed by the administrative law judge right near the end of the decision on whether it's sedentary or light work. But the point being that when you're looking for evidence of improvement from 2009 to the time the administrative law judge selected, what you really see is not much physical improvement. There really doesn't factor into it, but what you do see is a failure to inquire adequately into the reasons why the claimant's mood disorder has not improved. She testified about this. The administrative law judge didn't like the testimony. She went through a number of neuropsychological examinations. The examination that's principally at issue here was done at about the time of the that if somebody is having trouble with depression, mood disorders, and has had a TBI, that the TBI, according to the literature, and according to the doctor's examination of Ms. Galan, the TBI is something... It's hard for me to translate. Traumatic brain injury, right? Yes. You guys have this code you talk in. Yes, and I'll try to stay away from the code as best I can, Your Honor. Trying to stay away from the code. The traumatic brain injury has continuing effects on somebody's ability to recover and adjust to various things going on with her, including mood disorders. So what this neuropsychological examination said was, I have looked at prior examinations. My results from testing are about the same as the prior results. I need to call to your attention that there is this continuing problem with mood, and that was the examination presented to the administrative law judge, the most recent one, and that was the examination the administrative law judge said, I will give this no weight. Yeah, I had trouble understanding why the ALJ... This is Dr. Cherry's report, that very long report. Yes, Your Honor. It appeared to me that the ALJ gives it no weight because there's some testing results in there with so on, that make it look as though, that say as to those tests, that she's basically average and normal, or even to some, in some fashions, high-functioning. And as I read the ALJ, he's saying, well if that's true, I won't believe anything else that Dr. Cherry puts in there in terms of mood disorder and memory and so on. And then Dr. Cherry writes a letter, later letter, he gets really mad, like can't you read or don't you believe me? I can't speak for Dr. Cherry here, and I won't try, but what Dr. Cherry... I shouldn't say he's really mad, he objects in fairly strong language to the ALJ's treatment of his report. Yes, the... from Dr. Cherry's perspective, the testing results that Dr. Cherry provided are consistent with testing results from earlier neuropsychs. So, for the administrative law judge to say, I'm giving this no weight partly because of the testing results, the response to that is, that is a reason for throwing out the earlier neuropsychological exams too. So, that's... Dr. Cherry, he says, having these testing results is fully consistent with the other things I'm telling you. Yes, that's exactly the way that that exam is listed, which means the first reason that the administrative law judge selected for not giving any weight to Dr. Cherry's examination is simply a non sequitur. He just doesn't believe Dr. Cherry's professional view that these tests can give you this and the other things that may also be true. I would put a little differently, your administrative law judge did not believe that what Dr. Cherry had to say about the effects of traumatic brain injury on mood disorders, whether pre-existing or things that arose after an accident. The administrative law judge didn't believe that the statements about mood disorder should be taken at accepted. That is one of the things that we think constitutes reversible error, that what we would ask you to do is to send this back to the administrative law judge so the administrative law judge properly can evaluate what's going on with the mood disorder. Because what the administrative law judge left himself in about cognitive impairments experienced by Ms. Galan and whether or not her test results on cognitive testing are improvements from what they would have been at the time of the accident. And that's not what Dr. Cherry set out to do. That's not what the earlier neuropsychological examination set out to do either. This is an issue where what is disabling for Ms. Galan, what's disabling for Ms. Galan is difficulty getting along in the workplace, frustration, losing concentration, and also the effects of her headaches. So by saying no wait to Dr. Cherry, the administrative law judge took the position where he did not have to factor mood disorders or headaches and the need for breaks into the hypothetical question he ultimately asked the question was focused only on what I will call cognitive impairment problems. The need to have the type of work where there are one to three step instructions and not in there at all is anything to do with need for supervision, to be careful in the workplace, need for getting along with co-workers, need to take breaks, need to be what Dr. Woods described as being in a quiet room and alone and able to recover from the headaches. Okay, now you're down to a little under three. Do you want to save? At this point, we've briefed the issues of credibility and we've briefed the issue of what the hypothetical question said I will reserve. Good morning and may it please the court I'm Christopher Brackett on behalf of the Commissioner of Social Security and from what it sounds like the court's questioning is its concern is really with the opinion of Dr. Cherry and I'm also concerned with the question of whether ALJ made the proper comparison of medical conditions as of 2009 and I'm not I understand there was a typo problem but that's not what I'm talking about and in April 2012. Well I think the court will find a review of the ALJ's full decision shows that he did consider all of the impairments that were available or that were applicable to this case. I'm sorry? The ALJ did consider all of the impairments that were used at the comparison point decision and then as medical improvement occurred. I could tell there's a paragraph in which the only paragraph in which he did this is a paragraph that reads something like this I'm trying to find it just a minute the medical evidence supporting a finding that as of April 12, 2012 has been a decrease in medical severity of the impairments present. This is a medical severity question right and this is what he says the medical evidence of record reveals a decrease in treatment that doesn't demonstrate a decrease in medical severity. Moreover neuropsychological testing revealed no more than minimal limitations but that's not a comparison and furthermore the claimants treatment records reveal no clinical evidence of significant mental impairment related limitations that's not a comparison. So where's the comparison? The comparison occurs over the course of the entire decision it starts off discussing the comparison point decision and the impairments that were considered then then the impairments that the claimant has now and then the ALJ makes this finding that medical improvement occurred and then as we progress through the decision it shows his medical analysis of the medical evidence. He's analyzing the medical evidence of now but he's not really well he's he's considering the evidence that is available now and back then and starting basically I mean he's considering evidence back from 2009-2010 the evidence that led up to the comparison point decision the evidence that followed now there was very little medical evidence that followed the comparison point decision we had a handful of counseling sessions scattered over a three and a half year period then we had a neuropsychological evaluation from Dr. Fuller in 2010 where he made largely found largely normal findings that there was really no mental limitation on working and we had the Dr. Holliday's opinion in January of 2012 where he said that her mood disorder is only mild her PTSD is mild and resolving and he found no barriers to the occupational functioning. None of those are comparisons. Well he's I think the picture that's being painted with all of this evidence spanning the course of several years draws comparison and shows her improved functioning. It may be implicating the propriety of the original decision but it isn't drawing comparison. Well it's showing that her functioning her functioning has improved and now it's showing that it's okay it isn't showing that it's improved. Well it's it's okay now and it was not okay before. What's not okay then? I'm sorry I didn't understand. First of all I thought it's not functioning that they're supposed to be comparing it's supposed to be medical conditions. Severity and the way they determined that medical improvement occurred is by a reduction in limitation in the residual functional capacity and the initial finding was that her residual functional capacity did not allow her to sustain concentration and persistence based on these the the TBI the traumatic brain injuries effect on some pre-existing conditions. Dr. Cherry so Dr. Cherry was the third of three examining psychologists in the record that was this was that was that came in I believe was August of 2013 and Dr. Cherry's opinion was addressed squarely by the ALJ. First of all it should be noted that Dr. Cherry did not really offer a vocational limitations. The ALJ points this out. He provided no opinion as the specific limitations that Ms. Gallant might have. His summary was basically that her most disabling limitation now it's unclear whether he was considering disability in the context of Social Security versus some other compared like workers compensation or ADA or something along those lines but that's not that doesn't play fully into the reasons why the ALJ decided not to give this opinion weight. That comes on page 38 of the supplemental excerpts of record. It's the 14th page of the ALJ's decision. First he notes and I have to take a step back here because the ALJ is considering not just a mood disorder. He's considering the claimants cognitive residuals from from the TBI and how that affects her functioning. So first he notes that the neuropsychological testing the measures of the cognitive functioning were largely normal. She had average academic and intellectual functioning and that was consistent with the earlier evaluation that the ALJ references which was Dr. Fuller's evaluation in 2010. So largely the same functionings after a battery of testing. Second Dr. Cherry reported no clinical observations in support of the opinion regarding claimants mood issues. That's where he starts to get into the mood findings. In Dr. Dr. Cherry's actual examination and most of it consists of these these the testing that addresses cognitive functioning. But he makes very little in the way of observations of her mood functioning. He does not perform a mental status examination. He records the claimants what the claimant reports to him and what the claimants mother reports to him. But basically he's only observation is when the patient described her mood as quote I don't know normal which appeared quote to quote Dr. Cherry generally congruent with her euthymic presentation. I'm focusing on euthymic when I say I'm quoting Dr. Cherry. That her mood was good at that time. She was appropriately sad when discussing elements of loss like her car accident and those challenges that she had back in 2008 in the rehabilitation. The third reason the ALJ points to is that Dr. Cherry references some some TBI literature. Some broad tracks about assessing a claimant assessing a patient who's had a TBI and that it can in fact support mood disorders. Well first first of all earlier on the ALJ does note that depression such affective disorders can can result from a traumatic brain injury. But the ALJ points out here that it's not necessarily the case here. And his point really is that there's not that statement of TBI literature does not specifically address Ms. Gallant and her functioning and what has resulted from her TBI. Fourth the ALJ points to Dr. Cherry's opinion was wholly unsupported by documented clinical findings from the treatment providers. Now since the comparison point decision as I mentioned earlier there's just been a few counseling sessions. Typically these these arose in context of life stressors. Ms. Gallant was at odds with her parents in January of 2010 over who would be her representative payee and went to counseling over that just to have someone to talk to. In September of 2011 her last treatment session before the cessation she was feeling the stress of being a new parent and it was coming up on the anniversary of her accident. You know these are normal situations that would exacerbate a claimant's functioning and even in these circumstances there was very little objective findings that would support the disabling mood disorder. And fifth the ALJ points to the the absence of any supporting objective and clinical findings leads led the ALJ to conclude that this at least in my experience in terms of the cases I've seen an unusual one because here they're trying to take her off benefits. And my understanding is that and the whole analysis that you're making goes to whether she was as if they were doing this ab initio but they weren't doing it ab initio. So there's the predecessor as my understanding is that there's a fairly rigid and requirement that the takeoff point be that there was a change and that's what's really medical change and that's what both you both the ALJ and you are not doing very much with. In other words maybe there was a weak case to begin with maybe she shouldn't have gotten maybe but what is there about what the circumstances were found to be in 2009 and what they're found to be now and where did the ALJ do that other than in the three sentences I read you? Well as I think I didn't do a good job of explaining. Well you did say all you said was all the way through but I didn't see it all the way through. Well early early on he explains that the time of the comparison point decision the impairments of depression and PTSD and we can see that he should have stated that there was a TBI involved as well. I think that the bulk of the decision as he's discussing. Tell me where you're reading from. Oh I apologize it's a page 27 of the supplemental excerpts of records it's a finding a fact number two. The ALJ goes through the what resulted at the comparison point decision and why she was found disabled. She would be unable to maintain adequate pace and persistence on a consistent basis. I'm sorry to mess this up I've got the ALJ give me the page number again. I have the supplemental excerpts of record page 27 I can try and dig that out of the actually appellants excerpts of records. I've got the we're looking at the ALJ decision correct? Correct. Give me the internal pagination on that. The page on the bottom right corner is 27 and then it's there's a list of finding a fact and number finding a fact number two. Okay I'm with you. Okay he addresses the comparison point decision and the claimant follow the claimant had the medically determinable impairments and then he state the ALJ states what the these impairments and how they affected the claimant. That she was unable to maintain adequate pace and persistence on a consistent basis. Unable to adequately cope with the routine stresses and hassles in the workplace. So he there's a list of findings and there is no finding that her medical circumstances comparing the it says what was true in 2000 at the time of the CPD and what was true on April 5th 2012 but there is no comparison. Well I think the comparison is in the lays out in the decision and how these findings are presented and it shows that her functioning now or functioning as it progressed was different than it was at the time of the comparison point decision. But again I thought the that the functioning is secondary first he has to find a medical change. Well I think the medical the lessening in severity of the medical impairment comes as a result of improved functioning and I believe that that's what that's what he said under a few pages later as page 30 it says that you know he discusses that there's a medical improvement resulted in an increase in the claimants residual functional capacity. The medical improvement is the one I read you before. Medical improvement occurred as of April 5th it's on page 30 2012 and then what I read you before decrease in treatment the narrow sort of like psychological testing revealed no more than minimal limitations and so on none of which are comparative so I don't know it's just not here as far as I can tell. Well even even even your honor when a decision like this is written with less than ideal clarity the the the comparison can be drawn from the from the decision as it's written out holistically and I think that's really shown in discussion that follows the residual functional capacity finding because he doesn't limit the ALJ doesn't limit himself to simply what's happened since the the secession date he does address medical evidence what little medical evidence there was that was derived during the the period of disability and this it shows a timeline a progression as as things as our impairments resolved and as things improved over the course of three three years and three odd years that the claimants cognitive functioning improved sufficiently that testing showed very little limitation and that her mood disorder improved sufficiently that it was just mild by the time of January 2012 when the ALJ when I Dr. Holliday examined her on behalf of the agency. Can you help me with something I maybe should know this but I don't I'm on page 11 of Dr. Cherry's report not his later letter but his report there's some numbers on the right hand at the bottom either 893 or AER 115. Yes your honor. Okay in the middle of that page it there's a kind of a table and it's headed ABAS dash I guess II summary what what is that? I don't know what the letters stand for it's just more of the code if you will from these medical cases. You can't help me with the code? I cannot just alphabet soup that we often see in these cases. It looks like it's a summary of the claimant's mother's reports to the client. That's what I'm trying to figure out because the paragraph before talks about the mother but then ABAS dash III summary suggests that it's actually a test I'm trying to figure that out. I can't tell. I'm not helpful in that regard your honor and I apologize. Maybe the other side will tell us. It says the patient's adaptive skill development is indicated in the following table. Right and I'm trying to figure out where the information that produces that table is coming from that because the first sentence in the paragraph talks about the mother there's a suggestion that's based upon the mother's information but that's only a so I'm trying to figure out if this is based on something other than what the mother says. Yeah as far as I can tell it's just what the mother says I mean that that's that's the I mean it would be a reasonable interpretation of that and well it would be a reasonable interpretation unless somebody could tell me what the code means. Right. Later on that same page we've got diagnostic interpretation. Yes. The current neuropsychological test findings so that what follows is coming out of the testing not from the mother and as we go through that I'll just cherry-pick a little bit in the middle of that sort of paragraph at the bottom of page 11 evidenced a consistent pattern of subtle attention deficit at the end of that paragraph she evidenced in other words this is coming from the testing this is not her sort of self reporting it's not a mother reporting a relative weakness with regard to her low average range performance on attention concentration the next page borderline range performance one measure of auditory working memory one measure of sustained attention second measure of sustained attention in other words we've got clinical psychological testing as he is doing it as a professional testing that's see how the ALJ can be justified in giving that no weight because the way the ALJ says there's no weight because it's inconsistent with the testing well this is this is what the testing shows this is a professional evaluation or diagnosis based upon the tests I see your point your honor I would say that these go to the cognitive limitations now these were I think dr. Cherry him self-acknowledged that they were consistent with the prior testing and that's one thing the ALJ found he understood that he did she didn't have cognitive limitations in fact the ALJ dr. cherry and he said repeatedly there her cognitive testing these these are cognitive testing the testing of memory and concentration and but in terms of her general intellectual functioning he said it was average average range from brutal abilities and so on sure and and I would point out that the ALJ did provide limitations that reflected I mean that he may have rejected dr. Cherry's opinion but he noted dr. Cherry's findings were his her his neuro is testing the cognitive testing that that this references were consistent with yes I'm sorry your honor I didn't mean to interrupt but yes it was the mood disorder that dr. Cherry really relied upon I assume I'm way over my time I apologize for that but thank you very much unless the court has further questions thank you may it please the court unfortunately I can't solve the acronym problem either as far as what the testing stands for but I can speculate about why it follows the analysis of what my client's mother was talking about there are sometimes reports and third-party function reports that are classified in terms of test results and that's what I would suggest was happening here that is described some things going on with her daughter and that was then classified by dr. Cherry into the table that's that's what I think happened but could be wrong the more important thing is that there is very little of the administrative law judge decision aside from the passage on difficulty concentrating and on depression that actually describes what her situation was like at the time she was found disabled so there is very little analysis in the opinion of improvement issues there's there's simply not much there what is there is as if this were a first-level decision simply describing what her condition was like at the time the administrative law judge was evaluating things at the hearing that's what this is about and so it leaves out the step of finding improvement and so that is a reason to say to the administrative law judge what's the net result then do we send it back yes your honor that that's the result we are asking as I understand it you at one point asked for I mean this is a nice situation because you have again the the baseline isn't no benefits it's benefits so has she stopped getting benefits she in fact stopped getting benefits before we went to court before you did what before we this case went to court she stopped getting benefits I believe during the state agency process leading up to the hearing with the administrative law judge okay and she's not getting benefits now so if we sent it back she would still not be getting benefits presumably and we would be arguing about medical improvement we would be arguing if necessary about current disability I'm sorry we would be arguing about current disability I would say both at the time of the hearing and now I see it would be back before the ELJ and one would hope he would take better account of the improvement analysis and of the mood disorder in the next set of proceedings that he goes through there are no further questions the red light is blinking yes thank you thank you very much both sides Gallant versus Bear Hill submitted for decision we've got two remaining cases we'll take a 10-minute break and we'll come back for the last cases
judges: Tashima, W. Fletcher, Berzon